# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**LORRAINE BRINKER,**

                    **Plaintiff,**

**-vs-**                                          **Case No.  6:09-cv-1637-Orl-DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

                    **Defendant.**

_____

## MEMORANDUM OPINION & ORDER

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **affirmed.**

### I. BACKGROUND

**A.      Procedural History**

Plaintiff filed for a period of disability and disability insurance benefits on December 7, 2005, alleging an onset of disability on May 20, 2004, due to back disorder and disc herniation, chronic pain, and sciatica.  R. 51A-52, 57-59, 85.  Her application was denied initially and upon

reconsideration.  R.39-42, 47-48.  Plaintiff requested a hearing, which was held on February 27, 2008, before Administrative Law Judge Gerald F. Murray (hereinafter referred to as "ALJ").  R. 239-66. In a decision dated April 1, 2008, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision.  R. 22-30.  Plaintiff timely filed a Request for Review of the ALJ's decision, which was denied on July 28, 2009.  R. 5-7.  Plaintiff filed this action for judicial review on September 24, 2009.  Doc. No. 1.

**B.       Medical History and Findings Summary**

Plaintiff was 47 years old on the date of the hearing decision.  She graduated from high school and attended one year of college R. 19, 51A, 244. Plaintiff had worked as a bookkeeper, cashier, secretary, and preschool teacher.  R. 62, 245-46.

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of pain in the back from two herniated discs, pain in the sciatic area, pain in the buttocks, pain in the right leg requiring a brace, depression and anxiety.  R. 243, 245, 247-50, 252. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from low back pain, neck pain, and right leg pain, which were "severe" medically determinable impairments but not an impairment severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 24.  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform sedentary/semi-skilled work with postural limitations and seizure precautions.  R. 24.  In making this determination, the ALJ found that Plaintiff's allegations regarding her medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment as explained in the body of the decision.

R 26.  Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work.

R. 29.  Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational

Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the

vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant

numbers in the national economy. R. 29-30.  Accordingly, the ALJ determined that Plaintiff was not

under a disability, as defined in the Act, at any time through the date of the decision.  R. 30.

Plaintiff now asserts three points of error.  First, she claims the ALJ erred by finding she had

the RFC to perform sedentary work contrary to her treating physician's statements.  Second, she

argues that the ALJ erred by improperly applying the pain standard and in evaluating her credibility.

Third, Plaintiff contends the ALJ erred by finding there was other work in the national economy that

Plaintiff could perform.   For the reasons that follow, the decision of the Commissioner is

**AFFIRMED**.

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct

legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings

are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The

Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C.

§ 405(g).  Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th

Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*,

402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

## III.   ISSUES AND ANALYSIS

### A.      RFC and the treating physician's opinion

Plaintiff claims that the ALJ should not have found her able to perform sedentary work in light of the opinion of Dr. McDonnell precluding the performance of sedentary work. The Commissioner

argues that other evidence in the Record, including the assessments of two state agency medical consultants and the objective clinical findings of a consultative examiner as well as Dr. McDonnell's own treatment notes, contradict his conclusions regarding Plaintiff's limitations and provide substantial evidence for the ALJ's decision.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callaghan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements.)

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1)

length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

Plaintiff contends that the ALJ should not have discounted Dr. McDonnell's RFC opinion because it was well supported by the record, which showed her work-related back injury in 2004 and consistent treatment for a period of more than four years for the condition, through the hearing date in 2008. She points to medical diagnoses of herniated and bulging discs, and tears, degenerative disc disease, osteoarthritis, and knee surgery, which were treated with prescriptions for multiple medications, physical therapy, and recommended pain management. R 127-28, 133, 136, 164-65. Plaintiff also points to evidence that the state agency psychologist who evaluated her opined that she was suffering from chronic pain. R 205-217. Plaintiff had also been placed off work by an orthopedic specialist, who opined she was not a candidate for rehabilitation because she was in too much pain. R 136.

The Commissioner argues that the ALJ articulated good cause for discounting Dr. McDonnell's RFC opinion because it was inconsistent with his own treatment notes which were devoid of any clinical findings that would support his opinion regarding Plaintiff's physical limitations, and in fact indicated some improvement, that at times she was exercising, and failed to explain an eighteen month gap (from December 2005 to July 2007) in treatment from him. Doc. 13 (citing R. 28, 142, 144, 148, 150, 152-56).

Dr. McDonnell was Plaintiff's primary care physician, treating her sporadically over a four-year period during 2004 to 2008 for a variety of complaints. R. 137-65, 227-38. Dr. McDonnell made it a point to tell Plaintiff at one point in September 2004 that he could not treat her for her back and she would have to see an orthopedic specialist related to her workers compensation case. R. 155. Although Plaintiff had seen two other orthopedic specialists – each for only a couple of appointments between 2004 and 2005 – Dr. McDonnell was the only physician who completed a residual functional capacity evaluation of Plaintiff in February 2008. R. 227-31. The ALJ rejected Dr. McDonnell's RFC opinion as inconsistent with his records:

A residual functional capacity questionnaire was completed by Dr. McDonnell on February 25, 2008. He opined that he has treated the claimant for the last four years for degenerative disc disease of the lumbosacral spine. Her prognosis was fair. He opined that she had moderate to severe low back pain, which radiated to her legs. He opined that her pain would frequently interfere with her attention and concentration and she would be capable of performing only low stress jobs. He opined that she could sit/stand/walk less than 2 hours and would need to alternate between these activities. He opined that should need [sic] to shift positions at will and take unscheduled breaks. She would need to elevate her legs above hip level 50% of the time. He opined that she could no more than occasionally lift/carry less than 10 pounds, rarely lift 10 pounds. She could no more than occasionally twist; rarely stoop and climb stairs; and never crouch, squat, and climb ladders. Furthermore, she would be absent from a job more than four days per month. (Exhibit 11F). Dr. McDonnell's report dated February 21, 2008 showed that the claimant had no joint deformities, muscle tenderness, or significant decrease in range of motion. She had normal gait, normal balance, normal motor, and sensation was intact. (Exhibit 12F).

As for the opinion evidence, the state agency medical consultants opined on February 20, 2006 that the claimant retained the residual functional capacity to perform light work with no ability to climb ladders, ropes, or scaffolds; and no more than occasionally climb ramps, stairs, balance, stoop, knee, crouch, or crawl. Furthermore she would need to avoid concentrated exposure to moving machinery and unprotected heights. (Exhibit 7F). On June 6, 2006 the state agency consultative examiner opined that the claimant retained the residual functional capacity to perform sedentary work with no climbing ladders, ropes, or scaffolds and no more than occasionally balance, stoop, kneel, crouch, or crawl; and avoid concentrated exposure to extreme cold, moving machinery, and unprotected heights (Exhibit 10F). The undersigned has considered these opinions and has found that they were reasonable based on the evidence available in the record at that time. He has given the opinion of the state agency in Exhibit 10Fconsiderable weight as it is *well supported by the bulk of the*

> *medical evidence of record as a whole*.  The opinion of Dr. McDonnell and contained
> in Exhibit 11F was also considered; however, this opinion was not consistent with the
> treatment notes of Dr. McDonnell and therefore was given little weight.

R. 28 (emphasis added).  Prior to discussing Dr. McDonnell's opinion, the ALJ had reviewed at length

the medical evidence from the records of the other physicians who had evaluated or treated Plaintiff,

and based his opinion on the "bulk of the medical evidence or record as a whole." R. 28.

At the time of her injury in April-May 2004, Plaintiff was treated at the Ormond Medical Arts-

Family Practice by Drs. Patel and Caraballo.  R. 173-74.  On April 13, 2004, Dr. Caraballo noted that

Plaintiff was seen for persistent musculoskeletal sprain, strain and spasm with thoracic and lumbar

spine, and she complained of pain on the left side but the right side was much better.  R. 176.

However, he noted that although she was given refills on the Norco to take as needed, she could have

"***no more refills as she already had a total of #60 tabs this month*** and the first prescription was dated

4/3/04 – she understands and will try to wean herself off the medication." R. 176 (emphasis in the

original).  She was released at that time for work at light duty, no lifting beyond 20 pounds, no

pushing or pulling and not to be sitting or standing for more than 1-2 hours at a time.  R. 176.  At the

next appointment on May 20, 2004, she complained of the pain and that hydrocodone was the only

thing that helped with the pain, and did not help 100%.  R. 174.  Three weeks later she was advised

to stop working and advised to rest until further evaluation by an orthopedist, which is when she was

referred to Dr. Gillesby of the Orthopaedic Clinic of Daytona Beach who saw her in June 2004.  R.

127, 129, 173.  In conjunction with discounting Dr. McDonnell's RFC opinion, the ALJ discussed at

length the opinion and treatment records from this orthopedic specialist, Dr. Gillesby:

> The objective medical evidence shows that the claimant presented to Dr. Albert
> Gillesby on March 15, 2004.  She reported that on March 15, 3005 after working as
> a cashier at Food Lion scanning heavy items such as dog food and water, she
> developed onset of back pain.  She stated that she tried working the rest of the week,
> although had progressive pain.  She did go to see Dr. Carabello [sic], and was
> diagnosed with lumbar sprain/strain syndrome, as well as muscle spasm.  She had x-

-8-

rays taken and was sent to physical therapy twice weekly, which actually increased her pain with exercise. She also tried some massage therapy, which was helpful temporarily. She had an MRI scan and was referred for evaluation. She currently reported constant pain to the lumbar spine. She required pain medication including Hydrocodone, Skelaxin, Percocet, and Celebrex. She stated that she has slightly more pain to the left side as compared to the right. She also complained of a spasm throughout her back region but denied any type of radiating pain at this time. She stated that her pain was worse with twisting, sitting, bending, or any type of lifting. Physical examination showed that she had minimal to no tenderness involving the lower lumbar spine area. She predominantly had tenderness in the thoracic spine and lower cervical spine. X-rays showed she had L5-S1 moderate degenerative disc disease and osteoarthritis, which was pre-existing. MRI of the lumbar spine showed she had L5-S1 degenerative central herniated nucleus pulposis and L5-S1 moderate degenerative disc disease and osteoarthritis pre-existing. Her work status was no work and she was found to be temporarily totally disabled (Exhibit 2F).

R. 26. At the initial examination with Dr. Gillesby on June 21, 2004 (about three months after her work injury), he noted that Plaintiff had "minimal to no tenderness involving lower lumbar spine area," even though that was the area shown on the MRI as having the herniated disc. R. 129. Dr. Gillesby informed Plaintiff that he was only approved by the workers compensation insurer to treat this area in her lumbar spine due to the work-related injury which was believed to be to that part of her spine. R. 129. He did not have permission to evaluate and treat her cervical and thoracic spine which was where Plaintiff "predominantly had tenderness" during his examination three months after the injury[1]. R. 129.

Plaintiff switched from Ormond Medical Arts - Family Practice physicians to Dr. McDonnell as her primary care physician in September 2004; her husband was a patient there. R. 156-57. She reported to Dr. McDonnell that she was involved in a workers compensation case for a back injury and was having a difficult time working through the system and obtaining relief for the pain. R. 156. He believed some of her insomnia and fatigue were from chronic pain; her medications included Hydrocodone and/or Oxycodone from a different provider. R. 155-56. He explained that she would

---

[1]Plaintiff testified that Dr. Gillesby told her that, because she did not have any pain radiating down through her leg, there was nothing he could do for her. R. 251.

need to find a workers compensation doctor to deal with the back pain and he would not be able to do that for her; she was advised to discuss it with her attorney.  R. 155.  In December 2004, he gave her range of motions exercises for her back.  R. 152.  By April 2005, Dr. McDonnell notes Plaintiff's report that she had actually won her workers compensation case and wanted to treat her back "more aggressively" if possible.  R. 150.  Plaintiff testified at the hearing that she had settled with Workers Compensation for $10,000.  R. 248.

Dr. McDonnell noted in April 2005 that Plaintiff was able to exercise "a lit bit more" and was going to continue to exercise for continued weight loss.  R. 150.  Plaintiff left messages with Dr. McDonnell's office that she was in a great deal of back pain in May 2005 and she was waiting for an appointment with Dr. Fulton; she asked Dr. McDonnell for a prescription for Percocet until that appointment.  R. 149.

It appears from the lack of records that Plaintiff was not receiving any orthopedic or specialized pain management care for a one year period, June 2004 to June 2005, when Plaintiff went to Dr. Fulton (allegedly referred by Workers Compensation, although other records indicate she reported her case settled by then – R. 150) for evaluation of back pain and consideration for the lumbar rehabilitation protocol.  R. 131.  The ALJ discussed Dr. Fulton's records:

Records dated June 6, 2005, by Dr. Michael N. Futon showed that she was referred by Workers' Compensation for evaluation.  Examination showed she ambulated with a cautious protective gait. Pelvis was slightly oblique.  She tended to list slightly to the left. Trunk flexion was approximately 40 degrees.  She described pain in the low back and the left buttock region as well as the mid back area.  Trunk extension was with a neutral position and caused discomfort. Straight leg raise appeared negative for sciatic irritation, although the claimant was apprehensive with straight leg raise.  Hip range of motion appeared fairly symmetrical without significant aggravation of pain.  The right knee demonstrated an anterior mid line scar, which was well healed.  She was very apprehensive with the right knee range of motion.  Neurological testing of the lower extremities including motor, sensation, and deep tendon reflexes appeared to be intact.  She was diagnosed with back pain with leg pain, degenerative versus herniated lumbar disc and mid back pain.  Dr. Fulton had a guarded prognosis for the claimant as far as her abilities to tolerate rehabilitation protocol. She would be maintained at a

> no work status with further disposition given at the time of review [of the MRI]. (Exhibit 3F).

R. 27 (citing R. 131-34).  Dr. Fulton's impression was "degenerative versus herniated lumbar disc" and no neurological compromise; he ordered a new MRI of both the lumbar and thoracic spine for verification of disc status.  R. 133.  The new MRI from October 2005 showed narrowing of the L5-S1 disc space, with granulation associated with the general bulging of the disc, and foraminal encroachment more noticed on the left than on the right.  R. 136.  The MRI from October 2005 of the thoracic spine showed a small syrinx at T7, but otherwise no significant abnormality noted; there was a generous canal dimension throughout the thoracic spine so the syrinx[2] did not appear to cause significant mass affect; posturing on the thoracic spine on the MRI appeared fairly normal, and the lumbar MRI demonstrated remarkable straightening of the spine.  R. 136.  Dr. Fulton opined that Plaintiff was not a candidate for his rehabilitation protocols at the time; she was in too much pain as she had reported to him, and he suggested a pain management consultation[3].  R. 136.  Even though Plaintiff was scheduled to see Dr. Fulton in November 2005, she called Dr. McDonnell's office to requested Percocet again in October 2005.  R. 146.

Notes from Dr. McDonnell in December 2005, state that Plaintiff was still going through a difficult time with Workers Compensation for a back injury (even though he noted back in April that she reported settling the case) and "she had a rather traumatic incident with a pain management doctor in Orlando."  R. 142.  Dr. McDonnell planned to "follow peripherally while she pursue[d] the back problems with workmans [sic] compensation plan."  R. 142.  However, there are no medical records whatsoever from a pain management doctor in the Record.  After that, Plaintiff kept obtaining pain medication from Dr. McDonnell, rather than seeing a pain management specialist. R. 141.  In January

---

[2]A syrinx is damage to the spinal cord due to the formation of fluid-filled area within the cord.

[3]Plaintiff testified that Dr. Fulton was "totally against having surgery."  R. 251.

2006 (without actually making an appointment to be examined) she obtained from him a prescription for Percocet and Vicodin, a muscle relaxer, and Lidoderma patches; she called the office wondering if she could use four or five in a twelve-hour period because she had a lot of pain, but she was told the dose would be too strong.  R. 139, 141

Plaintiff was re-examined at Ormond Medical Arts-Family Practice[4] in February 2006, but not for primary care treatment which she had ceased in 2004, but for a SSA consultative examination.  R. 166.  The ALJ discussed the consultative examination report:

> The claimant attended a consultative examination on February 10, 2006, performed by Dr. James R. Shoemaker.  Physical examination showed that she performed all range of motion exercises in a very slow deliberate fashion.  The claimant's pain was out of proportion with her history.  She was able to get on and off the examination table without assistance.  Examination of her neck was supple without masses or adenopathy.  Examination of the spine showed cervical spine point tenderness throughout, which was mild.  She had no particular thoracic spine point tenderness.  She did have moderate lumbar sacral spine point tenderness throughout. he had no definite para-vertebral muscle spasms, but did experience tenderness to palpation at the back musculature throughout bilaterally.  Straight leg testing did produce pain in the lower back, hamstring, and glut [sic] region on the left.  Straight leg raise test was negative on the right.  The upper extremities revealed full range of motion of all upper extremity joints including the wrists, elbows, and shoulders.  Grip strength was 5/5 bilaterally and fine manipulation skills were within normal limits at both upper extremities.  She has no difficulties manipulating buttons, opening doors, or writing with a pen.  Lower extremities revealed range of motion of the hips knees, ankles, and feet, wee within normal limits.  Her knee was stable with a negative Lachman's maneuver.  She had no other joint deformities or abnormalities throughout her lower extremities.  She ambulated in a heel to toe fashion with slow narrow steps; however, was stable.  Her balance was good and she did not require an assistive device for ambulation.  She was assessed with chronic low back pain; left lumbar radiculopathy; and L5-S1 and L3-4 disc bulge, by MRI of May 2004 (Exhibit 5F).

R. 26-27.  By the time Plaintiff was re-examined at Ormond Medical Arts-Family Practice in February 2006, she reported having been "evaluated" for pain management, but not receiving any pain management treatment, although she was on medications including Lidoderm patch, Oxaprozin,

---

[4]The ALJ inadvertently cited the consultative examination report of Dr. Carpenter as the report of Dr. Shoemaker – his practice partner at the who is listed first on the letterhead.  R. 27.

Celebrex, Skelaxin, and Hydrocodone/APAP (apparently from Dr. McDonnell according to his records).  R. 166.

Based on the medical records overall, Plaintiff's sparse orthopedic or non-existent pain management care over long periods, and lack of even primary physician care for a year and a half, belie her complaints of debilitating pain from a back injury.  Three months after injuring her back at work, in June 2004, Dr. Gillesby the orthopedist, determined that Plaintiff had minimal to no tenderness at the location of the herniated disc on the MRI; however, he was not approved to treat her for the thoracic spine, where she did have some tenderness.   Plaintiff reportedly settled her workers compensation case in April 2005 (R. 150) for $10,000. R. 248.  Rather then immediately seeking further orthopedic care, she waited an entire year until June 2005 before returning to a different orthopedist, Dr. Fulton, who also said he could not help her with rehabilitation because she was in too much reported pain; she needed to see a pain management specialist instead.  Plaintiff either did not see one at all (there are no such treatment records in the Record) or, she had a negative experience with one and chose not to seek out further care (R. 142) and did not even return to see her primary care physician, Dr. McDonnell, from December 2005 until July 2007.  From July 2007 to early 2008, it was Dr. McDonnell, the primary care physician and not a pain management physician, who (without further comment) continued to prescribe these narcotic pain medications for Plaintiff, including Hydrocodone-acetaminophen and Percocet, without insisting that she follow up with the pain management specialist.  R. 233, 236.

Plaintiff's counsel faxed him an RFC questionnaire to complete on February 18, 2008. R. 227.  Without ordering any new objective testing or conducting a new examination of Plaintiff's orthopedic system (like Dr. Fulton did in 2005), Dr. McDonnell completed a RFC questionnaire on a non-SSA form opining that Plaintiff had moderate to severe low back pain, which radiated to her lower

-13-

extremities.  R. 227.  The clinical findings and objective signs were listed as decreased range of

motion in lumbar spine.  R. 227.  He opined that Plaintiff was capable of low stress jobs, could sit for

thirty minutes or stand for ten minutes at one time, or for a total of less than 2 hours in an eight hour

day.  R. 228-29.  However, at an appointment just prior to Dr. McDonnell filling out the form, on

February 21, 2008, Plaintiff was merely seen for follow up of lab results; the records do not list

complaints of back pain, nor do they show any examination of her spine as at previous appointments.

R. 232.  At the only two previous appointments in the *two years* before he completed the RFC

questionnaire, in July and November 2007, Dr. McDonnell's notes under "musculoskeletal/spine"

record "no joint deformities, muscle tenderness or significant decrease in range of motion

appreciated."  R. 234, 237.

Accordingly, the ALJ accurately cited Dr. McDonnell's RFC opinion and properly discounted

it.  He was also entitled to rely on the opinions of two state agency reviewing physicians who opined

that Plaintiff could sit, stand, and walk for 6 hours in an 8-hour workday, lift at least 10 pounds

occasionally, with other postural and environmental limitations (not at issue here).  R. 184A-87, 220-

23.  The ALJ found the state agency opinions were reasonable based on the evidence available in the

record at that time and gave the opinion of one of the state agency physician (in Exhibit 10F - R. 220)

considerable weight finding it was well supported by the bulk of the medical evidence of the record

as a whole.  R. 28.  The ALJ accurately cited the other evidence of record based on objective test

results from Drs. Gillesby and Fulton, and the consultative examination.  As such, the ALJ's opinion

was based on substantial evidence.

### B.      Pain and credibility

Plaintiff asserts that the ALJ erred in evaluating her credibility and her subjective complaints

of pain due to back and leg pain.  Plaintiff contends that there was significant medical evidence to

support Plaintiff's complaints as to the limiting effects of her impairments.  She contends that the ALJ

failed to provide adequate and specific reasons for discrediting her complaints.

Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).

The ALJ must consider all of a claimant's statements about his symptoms, including pain, and

determine the extent to which the symptoms can reasonably be accepted as consistent with the

objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and

laboratory findings show medical impairments which reasonably could be expected to produce the

pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either
> (2) objective medical evidence that confirms the severity of the alleged pain arising
> from that condition or (3) that the objectively determined medical condition is of such
> a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone

can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,

conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

The ALJ did not refer to the Eleventh Circuit's pain standard as such, he clearly was aware

of the governing standards for evaluating subjective complaints because he cited the applicable

regulations and Social Security Ruling ("SSR") 96-7p.  R. 25.  *See Wilson v. Barnhart*, 284 F.3d

1219, 1225-26 (11th Cir. 2002) (per curiam) (ALJ properly applied the Eleventh Circuit pain standard

even though he did not "cite or refer to the language of the three-part test" as "his findings and

discussion indicate that the standard was applied").  The ALJ complied with those standards in that

he first determined Plaintiff had an objective medical condition that could give rise to the alleged

symptoms, because otherwise the ALJ would not be required to assess the credibility of her alleged

symptoms.

-15-

Having concluded that he had to make a credibility determination of Plaintiff's subjective complaints, the ALJ plainly recognized that he had to articulate a reasonable basis for his determination.  In that respect, immediately after discussing Plaintiff's RFC, the ALJ stated:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.
>
> * * *
>
> [Summarizing the medical evidence of Plaintiff's physical condition in the Record[5].]
>
> The claimant attended a general clinical evaluation with mental status on February 13, 2006, performed by Dr. Malcolm J. Graham.  Records show that the claimant presented walking stiffly with a brace on her right knee.  She reported that she had worked as a secretary and receptionist for a law firm.  She has also worked as a secretary for a human resource department and a bank.  She last worked in May 2004 at Food Lion.  She reported that she suffered from tow herniated discs, which were diagnosed in May 2004 as well as degenerative disc disease.  She has had no back surgeries.  She had two knee surgeries with the last one being in August 2005, when she had arthroscopic surgery because of a fractured knee. . . . In regards to daily function she reported that she gets up, eats, and takes her medications.  She then lies down on the heating pad for 35-45 minutes. She feeds her pets, reads the paper, or goes outside.  She visits with her neighbors and has lunch. She might sit outside or lie on the heating pad for another hour.  She folds and puts away clothes, checks the mail, pays bills, or talks to her family.  On the weekends she might visit her mother, spend time with her children, go to theme parks, and go to the grocery store.  She does go to church on Sunday.
>
> * * *
>
> In sum, while the claimant seems to suffer from chronic pain, records show that on February 10, 2006, the consultative examiner that the claimant performed all ranges of motion exercises very slow and in a deliberate fashion; however her pain was out of proportion with her history.  She was able to get on and off the examination table and chair without any assistance.  Negative straight leg raise and grip dexterity was intact.  She had normal gait, heel/toe walk, and no deficits, deformity, inflammation, and atrophy.  Neurologically she was intact.  In addition while Dr. McDonnell opined

---

[5]Most of the ALJ's summary of the medical evidence was quoted in Section A, supra.

that the claimant would only be able to perform a significantly reduced range of sedentary work, his treatment notes showed that she had normal gait, normal balance, normal motor, and sensation was intact.  She had no joint deformities, muscle tenderness, or significant decreased in range of motion.  The claimant testified that she lies down the majority of the day; however, in the consultative examination dated February 13, 2006, she reported that she spends her day doing household chores, taking care of her pets, reading, visiting neighbors, and doing things with her children (going to theme parks), and driving.  In addition despite her continued low back pain, she had not had any surgery for this problem.

R. 26, 29.

Plaintiff contends that the ALJ's analysis of Plaintiff's credibility was not correct under the SSA regulations and case law.  She argues that she never testified to being totally incapacitated, and there were several medical opinions that Plaintiff suffered from a herniated disc, degenerative disc disease, and osteoarthritis.  Instead, Plaintiff argues, the medical opinions from the specialists indicated that she suffered significant pain, moved slowly, at times suffered from an awkward gait, and had difficulty sleeping[6].  Plaintiff also argues that just because she appeared to have normal gait and balance in some testing, does not mean she did not suffer from restrictions from the pain. Plaintiff also argues that the ALJ did not properly analyze other factors he is to consider, such as the effects of medication on Plaintiff's ability to function, the length of time Plaintiff had suffered from the pain – four years, the need for her to lay down during the day, and the consistent nature with which she complained of pain from her back and knee impairments to almost all of the medical providers.  She further argues that there is no medical opinion in the record that Plaintiff needed surgery or someone with her impairment would need it.

The Commissioner cites Plaintiff's testimony of chronic and debilitating pain, including constant back pain, pain in her right leg:  her right knee "swell[s] up like a balloon" when walking 40 to 50 feet, she could only walk about 50 feet until she has to stop or take a break, she could not

---

[6]Although Plaintiff argues that she also had difficulty concentrating (*see* Doc. 12 at 21), she does not challenge the ALJ's mental health findings.

stand for more than 15 to 20 minutes, sit for more than 20 to 30 minutes, touch her toes without pain, kneel or squat, and she could not lift a gallon of water without experiencing a sharp pain in her back. R. 245, 248-49, 250, 253-55. The Commissioner contends that the consultative examiner opinion of February 10, 2006 support the ALJ's conclusion; Dr. Carpenter opined that Plaintiff's "pain is out of proportion with her history." R. 28, 166-68. The Commissioner also cites other evidence of normal findings in Dr. McDonnell's records and Plaintiff's statements about her daily activities to Dr. Graham performing the psychological consultative examination.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

In this case, the ALJ offered specific reasons for discrediting Plaintiff's subjective complaints, including inconsistencies between Plaintiff's reports and the examination findings by the orthopedists and the consultative examiner, as well as inconsistencies between her statements and her activities of daily living as described in Dr. Graham's consultative examination report. These are factors the ALJ is directed to consider. 20 C.F.R. §§ 404.1529; 416.929. The ALJ's reasons for discounting Plaintiff's credibility concerning her symptoms and pain are supported by substantial evidence.

### C.     Hypothetical to the VE

Plaintiff argues that the ALJ erred in relying on the testimony of the Vocational Expert (VE) because it was based on an incomplete hypothetical. The Commissioner contends that the ALJ properly relied on the VE's testimony because more specific information about Plaintiff's postural

and other limitations would not have changed the VE's testimony in that those limitations did not affect her ability to perform unskilled and semi-skilled sedentary work.  The Commissioner also argues that any failure by the ALJ was harmless because substantial evidence in the record demonstrated that Plaintiff was capable of performing the full range of sedentary work.

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote*, 67 F.3d at 1558.  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant, *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989), which he may do by calling a VE to establish whether the claimant can perform work which exists in the national economy.

The Plaintiff is correct that case law in this circuit requires that the ALJ pose hypothetical questions which are accurate and supportable on the record and which contain all limitations or restrictions of the particular claimant.  *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985).  Where the hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence.  *Id.* at 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

Plaintiff argues that the ALJ failed to make any findings concerning Plaintiff's overall physical restrictions despite several being noted in the record, and never presented any physical restrictions to the VE as part of a hypothetical question.  She contends that the ALJ never indicated how the restrictions presented to the VE accurately mirrored Plaintiff's limitations, such as her complaints that she had to move slowly due to the pain and side effects of the medications, and had to take naps daily.  The ALJ was not required to ask the VE about non-exertional impairments that he had previously discounted based on substantial evidence (as discussed above).

The Commissioner argues that, contrary to Plaintiff's assertions, the ALJ did include Plaintiff's physical limitations in his questions to the VE and the VE testified none of the limitations had any effect on her ability to perform the full range of unskilled or semi-skilled sedentary work, citing R. 262-65.  The Commissioner argues that the ALJ actually did find Plaintiff capable of performing sedentary, semi-skilled work with postural limitations and seizure precautions, citing R. 24.  While the ALJ did not explicitly state the extent of Plaintiff's postural and seizure limitations, the Commissioner argues that it is clear from the ALJ's decision on R. 28 that he adopted the state agency reviewing physician's (Dr. Long's) RFC assessment in its entirety because the ALJ stated that he gave "considerable weight" to this opinion, specifically Exhibit 10F (R. 219-26).  The state agency reviewing physician's RFC Assessment opined that Plaintiff was capable of sedentary work and limited Plaintiff from concentrated exposure to hazards, such as machinery and heights.  R. 220, 223.  The reviewing physician also specifically found that Plaintiff could frequently climb ramps or stairs; occasionally balance, stoop, kneel, crouch, and crawl; but could never climb ladders, ropes, or scaffolds.  R. 221.

The ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of the sedentary level of work[7] had been impeded by additional limitations.  R. 24. Thus, he started his questioning of the VE by asking her to limit the jobs to sedentary ones.  R. 264.  He then added the limitations of "what we usually refer to as seizure precautions, no machinery."  R. 264.  The VE responded that the "seizure precaution" limitation would not have much effect on sedentary jobs, "almost by definition."  R. 264.  The ALJ then added additional postural limitations, asking the VE to add limitations like "climbing, crawling, stooping, and those sorts of things," and the VE testified that these limitations would not have any impact on the base of sedentary work at all skill levels.  R.

---

[7]The ALJ found that Plaintiff would be unable to perform her past relevant work, which was all at the light level (as performed).  *See* R. 263 (confirming with the VE); R. 29.

264.  When the ALJ further narrowed the field of available positions to semi-skilled jobs (with SVP levels of 2, 3, or 4) within the sedentary base, there were still at least 500 job titles available.  R. 265.  The VE explained that these numbers reflected only job titles, and each job title would represent numerous actual jobs. R. 265.

The Commissioner argues that although the ALJ asked only generally about the impact of postural limitations for climbing, crawling, and stooping on sedentary work, a question including the specific degree of Plaintiff's postural limitations would not have affected the VE testimony or the final administrative result. The Commissioner cites SSR 96-9p, which provides that "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." Under the SSA regulations, the limitations of "climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling" would not have an impact on the sedentary job base, as the VE agreed.  R. 264.  Plaintiff does not challenge the VE testimony regarding these limitations; however, she challenges the VE's opinion that a postural limitation on stooping would not impact on the sedentary base.

The ALJ  specifically asked the VE whether the sedentary job base would be limited if the ALJ added the postural limitation of stooping.  R. 264.  Plaintiff argues that the VE's opinion was not based on substantial evidence because she testified that a limitation on stooping would not have any impact on the sedentary job base.  R 264.  Plaintiff argues the VE's opinion was contrary  to Social Security regulations that note "a complete inability to stoop significantly erodes the unskilled sedentary occupational base and usually results in a finding an individual is disabled." Doc. 12 (citing SSR 85-15).

The Commissioner argues that the limitation the ALJ was asking about was for "occasional stooping" because it was clear that the ALJ was relying on the state reviewing physician's opinion in Exhibit 10F (R. 221 – limiting Plaintiff to stooping "occasionally"), and social security regulations state that a restriction to occasional stooping will not significantly erode the occupational base for sedentary work.   Doc. 13, citing SSR 96-9p.   Plaintiff concedes that a limitation of stooping occasionally only minimally erodes the occupational base of unskilled sedentary work, and some of opinions of record of Plaintiff's RFC indicated occasional stooping, however, Plaintiff argues that the VE's opinion was that any limitation on stooping would not erode the sedentary occupational base in contravention of the SS regulations.   She argues it was error for the ALJ to not clarify the level of limitation on stooping and to rely on the VE's opinion which was erroneous if the limitation was "never stooping."

Although the ALJ's hypothetical questioning of the VE was awkwardly worded[8], the Court can presume that the ALJ is familiar with the social security regulations which state that the sedentary occupational base is not eroded by a limitation of occasional stooping (SSR 69-9p), and that is the restriction he imposed in light of his RFC finding that Plaintiff had postural limitations, with the "great weight" he gave to the reviewing physician's opinion in Exhibit 10F.   The ALJ's reliance on the RFC opinion of the state agency physician, which explicitly opined that Plaintiff was capable of "occasional stooping" was based on substantial evidence. R. 24, 28[9].   *See Marus v. Commissioner*, 2008 WL 728317, *2 (D.S.C. 2008) (holding that the ALJ fairly set out the plaintiff's limitations in the hypothetical he posed to the VE based on the state agency physician's report finding plaintiff could

---

[8]Rather than starting with the specifics of Plaintiff's limitations, the ALJ began by questioning the VE about the vast number of DOT job titles, and asking if certain hypothetical limitations would eliminate whole categories of titles.

[9]Both reviewing physicians opined Plaintiff was capable of occasional stooping.

-22-

occasionally crouch, which is a physical movement more strenuous than stooping under SSR 85-15); *cf. Piatt v. Barnhart*, 225 S. Supp. 2d 1278 (D. Kan. Sept. 27, 2002) (remanding for further proceedings where there was no evidence that Plaintiff could occasionally stoop and that limitation was asked of the VE). The ALJ's reliance on the VE's responses, in light of the ruling in SSR 96-9p that a limitation of occasional stooping does not preclude sedentary work, was also based on substantial evidence.

### IV.  CONCLUSION

The record in this case shows that Plaintiff does not enjoy full health and that her lifestyle and activities are affected by her ailments to some degree. The ALJ appropriately considered these circumstances and analyzed them in relation to the exacting disability standard under the Social Security Act. For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence. Accordingly, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on January 24, 2011.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record